# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**BARI BEASLEY,**
      Plaintiff,

v.
                               Civil Action No. _____

**SHELLY BIRDSONG, PAMELA**        **JURY DEMAND**
**CHANDLER, MARY LANKFORD,**
**MIRIAM WIGGINS, CYNTHIA**
**STIELOW, WALTER GREEN**,
and **JOHN AND/OR JANE DOE(S) 1-10,**
      Defendants.

## COMPLAINT

Plaintiff Bari Beasley ("Plaintiff" or "Ms. Beasley"), by and through her undersigned counsel, brings this Complaint against Defendants Shelly Birdsong, Pamela Chandler, Mary Lankford, Miriam Wiggins, Cynthia Stielow, Walter Green, and John and/or Jane Doe(s) 1-10 (collectively, "Defendants"), and alleges as follows:

### INTRODUCTION

1. This action arises out of the unauthorized acquisition and publication of Plaintiff's confidential and privileged electronic communications, personal records, and financial documents, combined with the widespread dissemination of false and defamatory statements, all orchestrated by anonymous individuals acting in concert to destroy Plaintiff's professional reputation, career, livelihood, and personal well-being.

2. Plaintiff is the Chief Executive Officer ("CEO") of the Heritage Foundation of Williamson County ("Foundation"), a registered non-profit corporation organized pursuant to the laws of the State of Tennessee.

3. The Foundation's mission is to preserve, promote, and advocate for the historic places, stories, and culture of Williamson County and Middle Tennessee.

1

4. On or about July 18, 2025, an anonymous group, calling itself the "Concerned Citizens of Williamson County" ("CCWC"), created a 128-page (or sometimes 135-page) document entitled "Save the Heritage Foundation" (the "Document"). This group included, at least, each of the Defendants. Defendants Shelly Birdsong, Pamela Chandler, and Mary Lankford, and perhaps others, created the Document using materials that belonged to Plaintiff and the Foundation. These materials were wrongfully obtained and transmitted to the CCWC (including Defendants Birdsong, Chandler, and Lankford) by Defendants Miriam Wiggins and Cynthia Stielow. The Document contained Plaintiff's internal communications, financial records, personal records, confidential records from the Foundation and other confidential information obtained, without authorization and/or exceeding the scope of any authorization, from electronic systems, combined with patently false and misleading allegations designed to injure Plaintiff's reputation in the community and harm her financially along with the Foundation.

5. The Document was distributed to numerous, notable members of the community, government officials, and Foundation donors. Excerpts of the Document were published by the Williamson Herald newspaper, as well as online. The publication of these materials constituted a coordinated effort to damage Plaintiff's professional reputation and personal standing in the community and to exert pressure on the Foundation's Board of Directors to terminate Plaintiff as CEO, and harm her financially. The publication of these materials has also injured the Foundation itself.

6. These actions violate both state and federal law. Among other things, they give rise to a civil action pursuant to 18 U.S.C. § 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, which provides a private right of action for any person injured in his or her business or property by reason of a violation of 18 U.S.C. § 1962. Defendants conducted and participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and conspired to do so, in violation of 18

U.S.C. § 1962(d), causing direct injury to Plaintiff's business and property. Plaintiff seeks treble damages, costs, and reasonable attorneys' fees as authorized by statute.

## PARTIES

7. Plaintiff Bari Beasley is a natural person and a resident of Williamson County, Tennessee.

8. Defendant Shelly Birdsong is a natural person and a resident of Williamson County, Tennessee. Birdsong is a former employee of the Foundation and owns Your Williamson magazine. Birdsong is one of the creators of the Document. Birdsong is the owner of the Gmail address "savetheheritagefoundation@gmail.com," which is one of the methods used to disseminate the Document via the interstate mails and wires. This is at least one of the email addresses that transmitted the 128-page version of the Document.

9. Defendant Pamela Chandler is a natural person and a resident of Williamson County, Tennessee. Chandler is a former member of the Board of Directors of the Foundation. She is one of the creators of the Document. Chandler is also the owner of the Gmail address "savingtheheritagefoundation@gmail.com," which is one of the methods used to disseminate the Document via the interstate mails and wires. This is at least one of the email addresses that transmitted the 135-page version of the Document.

10. Defendant Mary Lankford is a natural person and a resident of Williamson County, Tennessee. She is also one of the creators of the Document. She is also a former board member of the Foundation.

11. Defendant Miriam Wiggins is a natural person and a resident of Davidson County, Tennessee. Wiggins is Plaintiff's former executive assistant at the Foundation. In that role, she improperly accessed Plaintiff's Foundation email, Foundation documents, and certain personal and private documents belonging to Plaintiff. Wiggins wrongfully obtained confidential documents belonging to Plaintiff and the Foundation and transmitted them to other members of the CCWC, knowing

that they would be transmitted using the interstate mails and wires to others in order to harm Plaintiff and the Foundation.

12. Defendant Cynthia Stielow is a natural person and a resident of Williamson County, Tennessee. Stielow is the Foundation's former Chief Advancement Officer. In that role, she improperly accessed the Foundation's confidential documents. She held that position from April 1, 2024, through July 18, 2025, the day the Document was circulated via the Internet and the mails. Stielow wrongfully obtained confidential documents belonging to Plaintiff and the Foundation and transmitted them to other members of the CCWC, knowing that they would be transmitted using the interstate mails and wires to others in order to harm Plaintiff and the Foundation.

13. Defendant Walter Green is a natural person and a resident of Williamson County, Tennessee. He is a local historian and author. He is among the people who illegally transmitted the Document using interstate mail and wires and the Internet to local government officials and major donors to the Foundation in an attempt to damage Plaintiff and the Foundation.

14. Defendants John and/or Jane Doe(s) 1-10 are individuals and/or organizations whose true identities and legal capacities are presently unknown to Plaintiff. Upon information and belief, these Defendants are persons or entities that participated in, facilitated, or conspired in the invasion of Plaintiff's privacy, defamation of her character, the unauthorized access to her electronic communications, and the unauthorized acquisition and publication of her confidential and privileged materials. In addition, these Defendants participated in the operation or management of the RICO enterprise, *i.e.*, the CCWC, through a pattern of racketeering activity.

15. Plaintiff will amend this Complaint to substitute the true names of these Defendants when their identities become known through discovery.

16. Upon information and belief, one or more of the Defendants resides outside the State of Tennessee or utilized electronic communications or instrumentalities of interstate commerce in furtherance of the tortious and illegal conduct described herein.

**JURISDICTION AND VENUE**

17. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Stored Communications Act, 18 U.S.C. § 2701 et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court also has federal question jurisdiction over this action pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil claims arising under the RICO statute.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims and derive from a common nucleus of operative fact.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of Tennessee, and the Plaintiff resides within this District. The Foundation is located in Williamson County, Tennessee, which is also within the Middle District. In addition, the enterprise is located and transacts its affairs in the Middle District. Finally, one or more Defendants resides within or is subject to personal jurisdiction in this District.

20. Personal jurisdiction over each Defendant is proper because each Defendant resides in Tennessee, committed tortious and illegal acts within the State of Tennessee, and/or committed tortious and illegal acts outside of Tennessee that caused injury within the State of Tennessee while engaging in substantial activities within or having other contacts with Tennessee.

5

## FACTUAL ALLEGATIONS
### The Foundation and Plaintiff's Role

21. The Foundation is a registered non-profit corporation organized under the laws of the State of Tennessee.

22. In 2017, Plaintiff became the Foundation's first CEO and has continued to serve in that capacity ever since.

23. During Plaintiff's tenure, she has grown and developed the Foundation in numerous ways, strengthening its role as a centerpiece of Williamson County. Among other things, while Plaintiff has been CEO of the Foundation, the Foundation has:

   A.      Raised more than $20 million in corporate and major gifts;

   B.      Grown total organizational assets from $12.5 million to approximately $35 million;

   C.      Grown net assets from $9.4 million to approximately $18.4 million, roughly doubling the net assets accumulated in the organization's first 50 years;

   D.      Brought in total revenue under her tenure of approximately $60 million;

   E.      Had a clean independent audit every year of her tenure, including in 2025;

   F.      Established the Moore-Morris History and Culture Center, the first state-of-the-art interactive history center in the county;

   G.      Purchased and preserved the former O'More College of Design campus;

   H.      Advanced Franklin Grove, previously the O'More campus, the largest preservation project in the Foundation's history, through ongoing restoration and a capital campaign;

   I.      Relocated the Lee-Buckner Rosenwald School, the last remaining in the county, which is a landmark African American preservation achievement; and

6

J.      Expanded staff, programming, donor cultivation, and community engagement.

24. In her role as CEO, Plaintiff maintains and utilizes electronic communications, including email, for Foundation business. These electronic communications are stored on electronic systems and are confidential and proprietary to the Foundation and to Plaintiff personally.

**First Anonymous Threat and Subsequent Activity**

25. On or about March 31, 2025, William Scales, then-Chairman of the Foundation's Board of Directors, and Laura Camp, a human resources consultant assisting the Foundation at the time, received an anonymous email from CarrieMcGavock@protonmail.com, entitled "Heritage Foundation Workplace Concerns with CEO." Protonmail is an anonymous email service. Carrie McGavock is the name of a woman who, with her husband, helped care for hundreds of wounded Confederate soldiers after the Battle of Franklin in November of 1864 during the Civil War. She is not someone who has ever worked for the Foundation. McGavock's is also the name of a restaurant in Franklin that certain of the Defendants are known to frequent. Upon information and belief, "Carrie McGavock" is a pseudonym for one of the Defendants and/or another member of the CCWC. In fact, prior to this email Defendants Wiggins and Stielow approached members of the Foundation's Board of Directors about a number of the issues raised in this email.

26. The email made numerous false allegations about Plaintiff and her management of the Foundation, her relationship with employees, and the financial condition of the Foundation. The email demanded that the recipients investigate Plaintiff. It stated that "[i]f there is no change we will go to the media. … If there is no immediate action and notification to staff that a complaint has been received this will go to the media."

27. In April 2025, the Foundation's Board of Directors met, investigated the allegations in the anonymous email, and gave Plaintiff a vote of confidence.

7

**The Unauthorized Access and Creation of the Document**

28. On or about May 20, 2025, Defendant Stielow transmitted confidential Foundation financial documents (used at an April 2025 Foundation board meeting) to Defendant Wiggins via email. These confidential financial documents ultimately were included in the Document.

29. In the months before July 18, 2025, Defendant Birdsong solicited assistance via email from both Foundation insiders and outsiders for a group of "concerned Franklin residents" who intended to "expose" Plaintiff and the "financial scandal" she allegedly created at the Foundation. Among other instances, on June 25, 2025, Defendant Birdsong emailed former Foundation Chief Financial Officer ("CFO") David Runyan soliciting his help. This group of people, some known and some still unknown, became the CCWC.

30. Members of the CCWC, including Defendant Wiggins, Defendant Stielow, Defendant Birdsong, Defendant Chandler, Defendant Lankford, and Defendant Green, agreed among themselves, and other members of the CCWC, including John Doe(s) and Jane Doe(s) 1-10, to gather and collect confidential information belonging to Plaintiff and the Foundation via interstate mails and wires (including email) and otherwise. They further agreed to create the Document using that confidential information belonging to Plaintiff and the Foundation, and they further agreed to disseminate the Document using the interstate mails and wires (including email) to the public, including government officials, members of the media, and major donors and potential donors to the Foundation, all in an effort to injure Plaintiff in her employment and business, her reputation in the community, and in ways that ultimately harmed her and the Foundation. Each member of the CCWC, including Defendants, knew, or recklessly disregarded, that the Document contained false representations and material omissions about Plaintiff and the Foundation.

31. In the months before July 18, 2025, Defendant Wiggins collected Plaintiff's confidential Foundation correspondence, including but not limited to Plaintiff's correspondence incorporated

8

into the Document, and, upon information and belief, transmitted them to other members of the CCWC, including the other Defendants, via the interstate mails and wires.

32. In the months before July 18, 2025, Defendant Wiggins also transmitted her own retirement investment account statement to herself, to other Defendants, and/or to other members of the CCWC via the Internet-connected scanner. That account statement became part of the Document.

33. In the months before July 18, 2025, upon information and belief, Defendant Stielow transmitted, or caused to be transmitted, various Foundation emails that were originally between herself, Plaintiff, and/or other Foundation employees, on their Foundation email system, using a scanner connected to the Internet, which then transmitted those documents via email to herself, other Defendants, and to other members of the CCWC.

34. In the months before July 18, 2025, these Plaintiff-related and Foundation-related documents were then circulated via interstate mails and wires, including via email, among the Defendants and various members of the CCWC for review and inclusion in the final Document. For example, on or about June 23, 2025, Defendant Birdsong transmitted Foundation financial information by email to other Defendants and members of the CCWC.

35. In the months before July 18, 2025, upon information and belief, Defendants Birdsong, Wiggins, Stielow, Chandler, Lankford, and Green, and other members of the CCWC, transmitted these confidential documents belonging to Plaintiff and the Foundation that they had obtained, over the Internet to create a false and inaccurate ChatGPT analysis of the documents. That analysis was then transmitted back to the preparer(s) of the Document, Chandler, Birdsong, and Lankford, over the Internet.

36. On or about June 25, 2025, Defendant Birdsong transmitted via email using her shelly@yourcommunity.media email address, several pages of "anonymous" letters, which later

9

appeared in the Document to Defendant Green, Brett Jones, Roger M. Walters, Alexa Baker, Stephen Fahey, Kim Wardlow, Marc Driskill, Bob Barrett, Raina Warren, Bob Ravener, Alan Simms, and possibly others. In her email, she admitted that she was receiving information "regarding the Foundation and its current leadership" from current and former Foundation employees and "other interested parties." She also admitted that she was soliciting additional information about Plaintiff and the Foundation and that "there is a group of us," *i.e.*, the CCWC, that is "working to investigate further."

37. On or about June 26, 2025, Defendant Walter Green transmitted, from his greenwr7@gmail.com email address, several pages of materials which later appeared in the Document to Alderman Patrick Baggett with instructions to "Please use discretely[sic]!"

38. On or about July 7, 2025, Defendant Stielow submitted her resignation from her position as Chief Advancement Officer of the Foundation, to be effective July 18, 2025. Stielow then left the Foundation on July 18, 2025.

39. On or before July 18, 2025, members of the CCWC, including at least Defendants Birdsong, Lankford, and Chandler, created the 128-page (or sometimes 135-page) Document, which is entitled "Save the Heritage Foundation." The CCWC is the RICO Enterprise, as discussed more fully below.

40. The Document that Defendants Birdsong, Lankford, and Chandler created included numerous false and misleading assertions about Plaintiff and the Foundation which Defendants Birdsong, Lankford, and Chandler knew would be transmitted to, and relied upon, by numerous others in the community via the interstate mails and wires. Defendants Birdsong, Lankford, and Chandler intended for this to occur as part of the CCWC's scheme. Among other material, the Document contained:

A. A cover letter, signed by the CCWC and dated July 18, 2025, which made numerous false assertions about Plaintiff and the Foundation, about misuse of Foundation funds, alteration of documents, and other alleged mismanagement, directed at both Plaintiff and the Foundation;

B. A ChatGPT analysis created by the Defendants relating to the Foundation, purportedly based on the materials contained in the Document. This analysis also included numerous false representations of the Foundation's activities and Plaintiff's conduct. The analysis also contained a discussion of the Foundation's financial condition and activities, falsely implying that there was financial mismanagement by Plaintiff and others at the Foundation and pointing to alleged "red flags" that suggested "overstated pledges, capitalized expenses, or manipulated timing of income," none of which in fact existed;

C. Internal electronic communications only intended for Plaintiff, between Foundation employees and Plaintiff;

D. Internal electronic communications only intended for Plaintiff, between Plaintiff and Defendant Stielow, including multiple emails from September and October of 2024 from Defendant Stielow to Plaintiff and the Foundation's CFO, describing the Foundation's financial condition and plans;

E. Confidential financial planning documents;

F. Internal Foundation material which the Document falsely represented had been "altered";

G. Other communications intended for Plaintiff only in her capacity as the CEO of the Foundation;

H. The Foundation's confidential financial information, including financial statements;

I. Confidential staff surveys of the Foundation's employees;

J. A confidential June 12, 2025, summary of those surveys emailed from Nashville HR (Laura Camp) to the Foundation's employees, including Defendant Stielow and Defendant Wiggins;

K. Anonymous letters, including a June 6, 2025, letter from a "Past Heritage Foundation Donor" sent to Defendant Birdsong, making false allegations about the Foundation's issues (which had been previously emailed by Defendant Green to Alderman Baggett); and

L. Financial information related to an investment retirement account attributable to Defendant Wiggins.

41. The Document included false allegations accusing Plaintiff and Plaintiff's family members of misconduct. Specifically, the Document accused Plaintiff and her family members of misconduct, such as misappropriation of corporate funds and conflicts of interest with the Foundation's Board of Directors. The Document further disclosed false details about Plaintiff and her family, including Plaintiff's minor daughter.

42. The false details related to Plaintiff and her family included the following:

A. The Document mischaracterized Plaintiff's receipt of private school tuition assistance for her minor daughter from a Foundation donor and board member as a conflict of interest. This arrangement was entirely unrelated to Plaintiff's position with the Foundation, arose from a personal friendship, and was accepted by Plaintiff with the full knowledge and approval of the Foundation's board chair.

B. The Document mischaracterized construction services provided by Plaintiff's husband to the Foundation as a conflicted transaction. This characterization is false. Although Plaintiff's husband provided construction services to the Foundation, he did so at below-

market rates, and the arrangement was negotiated by and through the Foundation's board chair, not Plaintiff.

C. The Document alleged another purported conflict of interest: that Plaintiff serves as executor and holds power of attorney over a major donor's estate. This is factually false. Plaintiff is neither the executor of, nor does she hold power of attorney over, any donor's estate.

D. The Document mischaracterized a board-approved preservation video project as a "$42,000…promotional video about [Plaintiff]." The Document also falsely represented that the Foundation spent $42,000 on makeup, hair, and wardrobe expenses for Plaintiff. These allegations are also false. In reality, the Foundation paid no such expenses for Plaintiff. The Foundation only paid the board-approved $15,000 budget, and any slight overage was covered by a board member.

43. The Document falsely stated that "Foundation funds [were] used to maintain a historic property owned personally by a board member." This statement is false. On the occasion in question, a board member personally paid $10,000 to a part-time contracted handyman for work on that board member's property. No Foundation funds were involved.

44. The Document contained repeated allegations about financial mismanagement but also failed to affirmatively mention that the Foundation has received clean audit reports for every year of Plaintiff's tenure. The Document also disclosed the Foundation's confidential consolidated audited financial statements for the year ending December 31, 2023. The Document, however, failed to acknowledge that those financial statements presented the Foundation's financial statements fairly, in all material respects, and were prepared in accordance with generally accepted accounting principles. The Document also failed to disclose that the independent auditor

13

determined that its audit did not identify any defects in the Foundation's internal controls that amounted to a material weakness or significant deficiency.

45. The Document also failed to include any statements from any past or present board finance chair discussing the financial condition or practices of the Foundation at any time, nor did it include any statements from the Foundation's auditors discussing their assessments of the Foundation's financial condition or practices. In reality, the Foundation's financial officers and auditors have concurred with the presentation of the Foundation's financial condition to the board and others, which have been fully transparent and accurate.

46. Instead of providing a complete and accurate picture of the Foundation's audits and financials, the Document's creators (Chandler, Lankford, and Birdsong, and perhaps others) generated a skewed analysis of the financial report by feeding selective documents to ChatGPT (the "Financial ChatGPT Analysis") designed to elicit a report that misrepresented the Foundation's financial position and undercut Plaintiff's leadership abilities. The Financial ChatGPT Analysis that Defendants Birdsong, Chandler, and Lankford created is flawed and misrepresents the facts in the following respects:

    A.    The Financial ChatGPT Analysis identified an alleged "massive drop in cash" for the Foundation between the beginning of 2024 and the beginning of 2025—from $2,425,569 to $1,218,334—as a "key area of concern." This analysis intentionally omitted that the Foundation's cash position fluctuates significantly on a monthly basis depending on the timing of donations, sponsorships, and festival proceeds. It also omitted that the Foundation's 2024 cash figure was inflated by an exceptional, one-time grant of $750,000, which was split evenly between the Foundation account and the Franklin Theatre account. Intentionally omitting this context was intended to, and did, exaggerate the apparent gap between the

14

Foundation's financial positions in those two years and invited readers to conclude Plaintiff caused or failed to avoid a significant cash shortfall for the Foundation in 2025.

B. The Financial ChatGPT Analysis identified a "questionable pledge receivables spike," noting a $1.1 million rise in the Franklin Grove pledge while omitting that most pledges to the Franklin Grove and History Center projects are substantial six- or seven-figure commitments. In fact, the Foundation received a $1,000,000 new pledge toward the Franklin Grove project in May 2025, which caused the significant increase in the pledge balance. Although the analysis frames this increase as "suspicious" or suggests it was used to "artificially inflate assets," the increase was accurately booked as a receivable and demonstrated continued community support for the Franklin Grove project.

C. The Financial ChatGPT Analysis stated that the "theatre preservation fee investment [was] nearly wiped out," again suggesting the Foundation was in financial peril while omitting that the purpose of the Theatre Preservation Fee is to fund repairs to the Franklin Theatre. In 2024, the Foundation was required to make significant repairs to the Franklin Theatre, including replacement of the air conditioning system as well as sound and lighting equipment. Although the cash account was depleted by these repairs, the Financial ChatGPT Analysis omitted any reference to either of the repairs and their associated costs, nor did it account for the fact that a preservation fee is added to each ticket sale and the cash account has been and will continue to be rebuilt as more tickets are sold.

D. The Financial ChatGPT Analysis also stated that the "Franklin Grove Construction Work-in-Progress increased dramatically" without providing any relevant context regarding the Franklin Grove construction project. Specifically, there was a significant increase in expenditures on the Franklin Grove project, which led to the $1.35 million growth in the account. The Foundation, in compliance with generally accepted accounting principles,

records funds used for capital projects—such as architect fees, construction costs, or engineering fees—as an asset that is not expensed. A significant increase in construction work and the associated monetary value of the asset indicates that donations are being used to advance the Franklin Grove project. These facts were also intentionally ignored and omitted from the Financial ChatGPT Analysis to lead the readers of the Document to believe Plaintiff was not appropriately stewarding the Foundation's assets and resources and therefore unqualified to lead the Foundation.

E. The Financial ChatGPT Analysis also alleged that the Foundation's sponsorship revenue is "way behind," yet failed to acknowledge that the Foundation historically receives the majority of its sponsorship revenue from events and festivals occurring during the second half of the year. Omitting this context effectively mischaracterized the Foundation's typical performance as behind schedule or indicative of mismanagement by Plaintiff, which it is not.

F. With respect to the alleged "huge gap in key areas," the Financial ChatGPT Analysis again omitted or failed to acknowledge that it would not be unusual for at least some of the identified projects to be behind the full-year budget at midyear because (a) the Franklin Theatre historically records a significant portion of its annual income in the last quarter of the year, and (b) the Heritage Ball does not occur until the last quarter of the year. By intentionally omitting these historical trends, the analysis mischaracterized the Foundation's midyear budgeting as more "evidence" of the Foundation's declining performance under Plaintiff's leadership.

47. The accuracy of a report or other answers generated by a large language model, such as ChatGPT, depends largely on the accuracy and completeness of information it is given and on which it is asked to base its conclusions. Defendants intentionally or recklessly failed to provide ChatGPT

16

with adequate information or context that would have led to the accurate conclusion that the Foundation's finances were being properly managed and disclosed in July 2025. For example, in 2024, the Foundation began work on several new projects, which impacted the Foundation's finances but were not sufficiently addressed by the Financial ChatGPT Analysis. In sum, Defendants' use of the Financial ChatGPT Analysis intentionally omitted facts that would have contextualized the financial figures and exposed the falsity of the issues the Financial ChatGPT Analysis erroneously identified.

48. The Document repeatedly misrepresented that false or "altered" financial information was provided to the Foundation's board, when in reality that has never occurred. The Document also mischaracterized internal cash-flow projections created by the Foundation's former CFO, which used conservative and/or worst-case assumptions regarding the Foundation's performance, as evidence of the Foundation's poor financial performance and as proof that Plaintiff and/or other Foundation employees altered financial statements before showing them to the board. In reality, the Foundation's board received complete financial reporting that was reviewed and approved by independent annual audits.

49. The Document repeatedly misrepresented expenses that Plaintiff paid personally as being paid by the Foundation. The Document also falsely stated that Plaintiff received annual bonuses, when the Foundation's financial records demonstrate that did not happen.

50. The Document also mischaracterized the Foundation's use of Franklin Theatre funds as suspicious and/or problematic. The Foundation's auditors confirmed that the Foundation owns the Franklin Theatre bank account and may use its funds for Foundation operations. The Foundation has maintained a transfer log as a transparency measure, and every dollar of the Franklin Theatre funds that has been withdrawn to pay or offset operational expenses of the Foundation has subsequently been fully returned to the account.

51. The Document called for an investigation of Plaintiff, the board, and the Foundation.

**Representative False Statements and Material Omissions Contained in the Document**

52. The Document contains numerous additional false statements of fact, materially misleading statements, and material omissions concerning Plaintiff, her family, and the Foundation. Although discovery is expected to reveal additional false statements, the following are representative examples of the false and defamatory statements published by Defendants:

53. The Document falsely states or affirmatively implies that Plaintiff engaged in financial misconduct, including that she misappropriated Foundation funds or otherwise used Foundation assets for her personal benefit.

54. The Document falsely states or affirmatively implies that Plaintiff altered, manipulated, or caused others to alter Foundation financial records or reports before they were presented to the Foundation's Board of Directors.

55. The Document falsely states or affirmatively implies that Plaintiff knowingly presented inaccurate financial information to the Foundation's Board of Directors.

56. The Document falsely states or affirmatively implies that Plaintiff concealed the Foundation's true financial condition from its Board of Directors, donors, auditors, and the public.

57. The Document falsely states or affirmatively implies that Plaintiff caused or contributed to financial instability at the Foundation through mismanagement or dishonest conduct.

58. The Document falsely characterizes Plaintiff's receipt of private-school tuition assistance for her minor daughter as an undisclosed or improper conflict of interest, despite the arrangement having been unrelated to Plaintiff's employment and known to and approved by the Foundation's Board leadership.

18

59. The Document falsely characterizes construction services performed by Plaintiff's husband as an improper conflicted transaction, while omitting that the work was negotiated through the Board Chair, performed below market rates, and not negotiated by Plaintiff.

60. The Document falsely states or affirmatively implies that Plaintiff served as executor of, or held power of attorney for, a major Foundation donor, thereby creating an alleged conflict of interest.

61. The Document falsely states or affirmatively implies that Foundation funds were used to pay approximately $42,000 for Plaintiff's personal hair, makeup, wardrobe, and promotional expenses. No such expenditures were made by the Foundation.

62. The Document falsely characterizes a Board-approved preservation video project as a personal promotional project benefiting Plaintiff.

63. The Document falsely states or affirmatively implies that Foundation funds were used to maintain property personally owned by a Foundation board member.

64. The Document falsely characterizes routine accounting practices, capital project accounting, pledge accounting, and seasonal cash-flow fluctuations as evidence of fraud, manipulation, or financial misconduct.

65. The Document falsely characterizes ordinary internal financial projections and planning documents as evidence that Plaintiff manipulated or concealed the Foundation's financial condition.

66. The Document falsely states or affirmatively implies that Plaintiff improperly received annual bonuses or other compensation that she did not, in fact, receive.

67. The Document falsely states or affirmatively implies that Plaintiff engaged in unethical conduct, breached her fiduciary duties, or otherwise acted dishonestly in the performance of her duties as CEO.

19

68. The Document repeatedly omits material facts necessary to prevent its statements from being misleading, including but not limited to the Foundation's repeated clean independent audits, Board approval of the challenged transactions, explanations provided by the Foundation finance committee, and other information demonstrating the accuracy of the Foundation's financial reporting.

69. Each of the foregoing statements was false when made or published. Defendants knew the statements were false, acted with reckless disregard for whether they were true or false, and intentionally or recklessly omitted material facts necessary to prevent the Document from creating a false and defamatory impression of Plaintiff.

### Nature of the False Statements

70. The statements identified above, and numerous additional statements contained throughout the Document, were presented by Defendants as statements of existing or historical fact, not as expressions of subjective opinion, rhetorical hyperbole, or protected commentary.

71. The Document repeatedly represents that its accusations are based upon documentary evidence, internal Foundation records, confidential emails, financial statements, employee communications, and other purportedly objective source materials. By presenting the Document in this manner, Defendants conveyed to readers that the factual allegations contained therein had been verified and were capable of objective confirmation.

72. Many of the challenged statements are objectively capable of being proven true or false through documentary evidence, witness testimony, financial records, Foundation corporate records, audit reports, Board minutes, banking records, accounting records, and other admissible evidence.

73. Among other things, the Document affirmatively represents as factual that Plaintiff engaged in financial misconduct, altered Foundation financial information, misappropriated Foundation assets, received compensation she did not receive, engaged in undisclosed conflicts of interest,

20

misled the Foundation's Board of Directors, and otherwise breached her fiduciary obligations. Each of those assertions is capable of objective verification and is not merely a statement of opinion.

74. Likewise, the Document repeatedly asserts purported factual conclusions regarding the Foundation's financial condition based upon selective excerpts of financial records and the Financial ChatGPT Analysis. Those conclusions were presented to readers as factual determinations derived from objective financial information rather than as speculation or personal opinion.

75. To the extent the Document expresses opinions concerning Plaintiff or the Foundation, those opinions necessarily imply the existence of undisclosed defamatory facts and/or are based upon false factual premises set forth throughout the Document. Such statements are therefore independently actionable under applicable Tennessee law.

76. Defendants intentionally presented their accusations in a manner designed to cause reasonable readers to believe that Plaintiff had actually engaged in dishonest, unethical, financially improper, or potentially unlawful conduct, rather than merely expressing disagreement with Plaintiff's leadership or management decisions.

## Facts Demonstrating Defendants' Knowledge of Falsity and Reckless Disregard for the Truth

77. Defendants did not merely express disagreement with Plaintiff's leadership or management of the Foundation. Rather, Defendants intentionally created and disseminated a document that purported to present an objective, evidence-based investigation supported by confidential Foundation records, internal communications, financial documents, and other purported source materials.

78. Before publishing the Document, Defendants possessed, had access to, or deliberately avoided, information demonstrating that numerous accusations contained therein were false, materially

21

misleading, or presented without information necessary to place those accusations in their proper context.

79. Rather than presenting a balanced or objective account of the underlying facts, Defendants selectively included only those documents, excerpts, and information that supported their predetermined narrative while intentionally omitting information that contradicted or materially qualified their accusations.

80. For example, Defendants repeatedly accused Plaintiff of financial misconduct while omitting that the Foundation had consistently received clean independent audits throughout Plaintiff's tenure as CEO, that the Foundation's auditors identified no material weaknesses in internal controls, and that the Foundation's financial statements were consistently presented fairly in accordance with generally accepted accounting principles.

81. Defendants likewise characterized ordinary nonprofit accounting practices, budgeting assumptions, cash-flow fluctuations, capital project accounting, and pledge accounting as evidence of financial misconduct while intentionally omitting facts known to them explaining those practices and demonstrating that they were consistent with accepted accounting principles and the Foundation's historical operations.

82. Defendants further omitted facts known to them demonstrating that numerous transactions and decisions criticized in the Document had been disclosed to, reviewed by, approved by, or undertaken with the knowledge of the Foundation's Board of Directors or its authorized leadership.

83. Defendants knowingly portrayed disclosed and approved transactions as undisclosed conflicts of interest while omitting material facts demonstrating that those characterizations were false or materially misleading.

84. Defendants selectively quoted and excerpted confidential emails, internal communications, financial records, and Foundation documents while omitting surrounding language, explanations, and context that materially altered the meaning reasonably conveyed by those documents.

85. Defendants further represented the Financial ChatGPT Analysis as an objective evaluation of the Foundation's financial condition while intentionally providing selective documents and omitting material financial information and contextual facts that would reasonably have affected the resulting analysis and conclusions.

86. Defendants did not undertake a good-faith effort to fairly evaluate the Foundation's operations or Plaintiff's performance. Instead, Defendants assembled a one-sided compilation of confidential documents, selective excerpts, incomplete financial information, and materially misleading factual assertions for the purpose of portraying Plaintiff as dishonest, unethical, financially irresponsible, and unfit to continue serving as the Foundation's CEO.

87. The omissions described herein were not isolated or inadvertent. Rather, the omitted information consistently favored one conclusion—that Plaintiff had engaged in financial misconduct, dishonesty, or ethical violations—even where the omitted information directly contradicted or substantially undermined those accusations.

88. Defendants intentionally presented the Document as a comprehensive factual investigation while concealing material facts that would have substantially altered a reasonable reader's understanding of the matters discussed therein.

89. Defendants' deliberate use of selective quotations, incomplete financial information, materially misleading omissions, and confidential records taken out of context demonstrates that Defendants either knew the challenged factual assertions were false or acted with reckless disregard as to whether those assertions were true or false.

90. Upon information and belief, before disseminating the Document to government officials, members of the media, donors, elected officials, and members of the public, Defendants made no meaningful effort to verify the accuracy of the serious factual accusations contained therein through readily available sources, but instead deliberately relied upon selectively presented information while ignoring or omitting material facts inconsistent with the narrative they intended to publish.

91. At no time before publishing the Document did Defendants contact Plaintiff to verify the accuracy of the numerous factual accusations contained therein, seek her explanation regarding the challenged transactions, or otherwise attempt to determine whether the accusations they intended to publish were true or false.

92. These materials were obtained from electronic storage at the Foundation without Plaintiff's or the Foundation's knowledge, consent, or authorization.

93. Upon information and belief, Defendants Stielow and Wiggins, and perhaps other John or Jane Doe(s) Defendants, gained unauthorized access to electronic communications and records belonging to Plaintiff and/or the Foundation by accessing, without authorization or in excess of authorization, electronic systems and stored electronic communications in which Plaintiff (and the Foundation) had a reasonable expectation of privacy. No Foundation employee was ever authorized to access Plaintiff's personal electronic communications or the Foundation's electronic systems and electronic communications to share them outside the Foundation or for purposes that harmed the Foundation or its employees, including Plaintiff.

**The Publication and Distribution of the Document**

94. On or about July 17, 2025, or July 25, 2025, the Document was transmitted via email and/or mail by unknown members of the CCWC, including John and/or Jane Doe(s), to the Attorney

General's Office for the State of Tennessee. In the transmittal of the Document, the sender specifically designated Plaintiff as the "person[] who may be responsible for this problem."

95. Between approximately July 18, 2025, and July 29, 2025, the Document in its entirety was published to many individuals within the community, including notable community members, government officials, and donors. This occurred by multiple methods.

96. In some instances, the Document was transmitted by email. Defendant Birdsong transmitted the Document to numerous others via email using her Gmail address, savetheheritagefoundation@gmail.com.

97. Defendant Chandler transmitted the Document to numerous others via email using her Gmail address, savingtheheritagefoundation@gmail.com. In addition, Defendant Chandler transmitted the Document to Ken Moore, the Mayor of Franklin, Tennessee on July 23, 2025, using her personal Gmail address, PChandler@live.com. In that email, Defendant Chandler admitted that at least she, Defendant Birdsong, and Defendant Lankford participated in creating the Document, "with help of documents and meetings from staff current and past." She also admitted that she had "met with several of our most respected and highly regarded people of our community" about her group's activities. And she also admitted that "[c]opies have been distributed to various media outlets and various appropriate state agencies."

98. On or about July 23, 2025, Rick Warwick received the Document by email, upon information and belief, directly or indirectly, from one of the Defendants.

99. On or about July 24, 2025, Greg Gamble received the Document by email, upon information and belief, directly or indirectly, from one of the Defendants.

100. On or about July 27, 2025, Alderman Bev Berger received the Document by email, upon information and belief, directly or indirectly, from one of the Defendants.

25

101. On or about July 27, 2025, Foundation board member Tyler Borders and William Scales each received the Document by email from savingtheheritagefoundation@gmail.com, the email address associated with Defendant Chandler.

102. On or about July 18 through July 29, 2025, Patrick Baggett received the Document via email, upon information and belief, directly or indirectly, from one of the Defendants.

103. On or about July 18 through July 29, 2025, Steve and Kay George received the Document via email, upon information and belief, directly or indirectly, from one of the Defendants.

104. On or about July 29, 2025, Foundation board chair William Scales and board member John Bond each received the Document, along with direction to commission an independent forensic audit and launch a legal investigation with respect to Plaintiff, via separate emails from Wanda Worries, a pseudonym with the email address, wandaworries@gmail.com. Upon information and belief, Wanda Worries is one of the Defendants or another member of the CCWC.

105. In other instances, Defendants and/or other members of the CCWC also uploaded the Document to iCloud so others could access the Document through an iCloud link. Defendants and/or members of the CCWC then shared the iCloud link with others via email. Each of these activities constitutes the transmission of the Document via interstate mail and/or wires.

106. In some instances, Defendants and/or members of the CCWC also uploaded the Document to Google Drive so others could access the Document through Google Drive. On or about July 22, 2025, Defendant Green created the Google Drive link used to share the Document using his Gmail address, greenwr7@gmail.com. Defendants and/or members of the CCWC also shared the Google Drive link with others via email. For example, on or about July 24, 2025, Defendant Walter Green transmitted the Document by emailing the Google Drive link to Ralene Debord, an important donor to the Foundation. Each of these activities constitutes the transmission of the Document via interstate mail and/or wires.

107. Upon information and belief, copies of the Document were also mailed to other individuals through the U.S. Mail or were deposited into mailboxes directly, without the requisite United States Postal Service postage. For example, Marty Ligon received the Document through the mail on or about July 26, 2025.

108. On or about July 26, 2025, the Document was transmitted by email to Foundation board member Hunter Jones by Defendant Chandler using the savingtheheritagefoundation@gmail.com email address.

109. On or about July 26, 2025, the Document was transmitted by email or by mail to the Williamson Herald newspaper by one of the Defendants, either directly or indirectly. Thereafter, on or about July 31, 2025, excerpts from the Document were published by the Williamson Herald newspaper in an article titled "Heritage Foundation Board Responds to Scrutinizing Allegations." Specifically, the article noted that "[t]he packet came to the Williamson Herald after receiving several anonymous letters to the editor over the span of several months containing similar concerns about the financial state of the Heritage Foundation."

110. Shortly after the Document's publication, excerpts from the Document were published on the Internet by the Facebook page entitled, "Williamson Wrong." "Williamson Wrong" is also published on the Internet at Substack.com. Upon information and belief, one or more of the Defendants, either directly or indirectly, caused the Document to be transmitted to the author of Williamson Wrong via the interstate wires (*i.e.*, email). Since the publication of the Document, Williamson Wrong has published at least three separate articles on the Internet about the Document, amplifying the false and misleading information in the Document.

111. In approximately September of 2025, less than two months after the Document was transmitted to the Tennessee Attorney General's office, that office began an investigation into various aspects of the Foundation's business activities.

112. In response to the allegations in the Document, the Foundation conducted an internal investigation of the allegations, including hiring lawyers and IT forensic experts, operations consultants, financial consultants, and auditors to determine whether the allegations in the Document were accurate. Upon information and belief, these investigations cost the Foundation well over $100,000. At the completion of these activities, it was determined that the Foundation's financial statements were accurately presented. After the publication of the Document, the Foundation once again received a clean audit from its auditor.

113. In publishing these materials, the Defendants and other individuals, including members of the CCWC, who collected the material in the Document, prepared the Document, and disseminated the Document not only disclosed privileged and confidential information but also embarked on a smear campaign targeting Plaintiff. The dissemination of confidential and privileged documents combined with unequivocally false statements (and material omissions) has directly damaged Plaintiff's reputation, emotional well-being, and directly caused her to suffer financial losses related to her business and employment. This dissemination has also caused substantial financial damage to the Foundation in terms of loss of donors and reduction in donations to the Foundation since the publication of the Document.

114. Upon information and belief, Defendants coordinated with one another and with other individuals to obtain Plaintiff's private and confidential communications from electronic storage systems, compile the Document, and distribute it throughout the community. Multiple Defendants, including Defendants Birdsong and Chandler, admitted to various third parties that they were part of a group that was working together and intended to publish alleged (but false) "financial scandals" at the Foundation under Plaintiff's leadership.

115. Plaintiff and the Foundation continue to suffer harm from continued actions taken as a result of the publication and dissemination of the Document. Franklin residents, both known and

28

unknown, have called for Plaintiff's termination from her position in both public meetings and in meetings directly with members of the Foundation board.

116. The Williamson Wrong has continued to post inaccurate articles about the Foundation and Plaintiff, based on the false and inaccurate statements in the Document, as recently as June 2026.

### Individual Participation of Each Defendant

**Defendant Shelly Birdsong**

117. Upon information and belief, Defendant Shelly Birdsong served as one of the principal organizers of the coordinated effort described herein. Among other things, Birdsong actively solicited confidential information from current and former Foundation personnel, recruited others to participate in the effort, coordinated communications among members of the CCWC, participated in preparing the Document, transmitted the Document and related materials to numerous third parties, and publicly promoted the accusations contained therein. Plaintiff has firsthand knowledge of this possession, having been inadvertently included in an email from Ms. Birdsong that distributed confidential information to other community members. In addition, Defendant Birdsong was identified by Defendant Chandler as being one of the individuals who created the Document.

**Defendant Pamela Chandler**

118. Upon information and belief, Defendant Pamela Chandler, a former member of the Board of Directors of the Foundation, actively participated in preparing the Document, received and utilized confidential Foundation materials obtained from current and former Foundation employees, admitted that she, Birdsong, and Lankford prepared the Document with assistance from current and former Foundation staff, and personally disseminated the Document to third parties, including elected officials and members of the community. Among other things, she

29

represented to Mayor Moore, regarding the Document, that "[c]opies have been distributed to various media outlets and various appropriate state agencies."

119. She also admitted that she was receiving help in creating the Document from "staff current and past" from the Foundation, including receiving documents from them. However, she was not authorized to receive or share either Plaintiff's own documents or emails, or Plaintiff's or Foundation documents or emails with others, including other Defendants or members of the CCWC.

**Defendant Mary Lankford**

120. Upon information and belief, Defendant Mary Lankford participated in preparing the Document, participated in meetings and communications relating to its creation, received and utilized confidential Foundation materials, and acted in concert with other members of the CCWC to publish and disseminate the Document. Defendant Lankford was identified by Defendant Chandler as being one of the individuals who created the Document. However, she was not authorized to receive or share either Plaintiff's own documents or emails, or Plaintiff's or Foundation documents or emails with others, including other Defendants or members of the CCWC.

**Defendant Miriam Wiggins**

121. Upon information and belief, Defendant Miriam Wiggins, a former employee of the Foundation who served as Executive Assistant to Plaintiff, improperly, and without authorization or, alternatively, in excess of any authorization, acquired confidential Foundation documents and Plaintiff's confidential communications through her employment with the Foundation, exceeded the scope of any authority granted to her, transmitted confidential materials to other members of the CCWC, and substantially assisted in providing the information used to prepare the Document.

**Defendant Cynthia Stielow**

122. Upon information and belief, Defendant Cynthia Stielow, a former employee of the Foundation who served as the Foundation's Chief Advancement Officer, improperly acquired and disclosed confidential Foundation communications and records obtained during her employment with the Foundation, transmitted those materials to members of the CCWC, and substantially assisted in the preparation of the Document through the disclosure of confidential Foundation information. Defendant Stielow was not authorized to access or share these confidential documents or emails with others, including other Defendants or members of the CCWC. Her last day as a Foundation employee coincided with the approximate day when the Document was published and disseminated.

**Defendant Walter Green**

123. Upon information and belief, Defendant Walter Green participated in disseminating components of the Document, including anonymous letters, before publication of the Document, transmitted portions of the Document and related materials to public officials and donors, assisted in the widespread distribution of the completed Document, and otherwise participated in the coordinated effort to damage Plaintiff's professional reputation and employment. Defendant Green met with Alderman Baggett and then subsequently circulated portions of the Document to Alderman Baggett, with instructions to remain discreet, in advance of the publication of the Document. Defendant Green uploaded the Document to Google Drive using his Google account credentials. Google Drive's metadata for the Document identifies "Walter Green" as its creator, confirming that Defendant Green uploaded the file and thereby controlled the Google Drive link through which the Document was later disseminated to influential donors and other members of the community. Upon information and belief, Defendant generated a shareable link to the Document and provided or made that link available to Defendants, thereby assisting with

31

publishing the false statements contained therein. Defendant Green was not authorized to receive or share either Plaintiff's own documents or emails, or Plaintiff's or Foundation documents or emails with others, including other Defendants or members of the CCWC.

**John and Jane Does**

124. Upon information and belief, additional individuals participated in acquiring confidential information, preparing the Document, disseminating the Document, communicating with recipients, concealing the identities of participants, or otherwise furthering the wrongful conduct alleged herein. Plaintiff will amend this Complaint to identify those individuals upon discovery of their identities.

125. Because additional facts are exclusively in the possession of Defendants and third-parties that bear on this Complaint, Plaintiff has attempted to discover the identities of John and/or Jane Doe(s) 1-10 through Rule 27 proceedings in Davidson County. To date, Defendants and various third-parties have vigorously contested these proceedings up to the Tennessee Supreme Court. Those proceedings are still ongoing.

Involvement of Other Individuals

126. Upon information and belief, Mary Catherine Mousourakis, a former employee of the Foundation, possesses knowledge of and participated in the creation, distribution, publication, or receipt of the Document. Defendant Wiggins directed Mousourakis not to disclose anything to the Foundation's attorney that was tasked with investigating the misappropriation and misuse of Foundation documents and materials.

127. Upon information and belief, additional individuals — including but not limited to Brian Laster and Alderman Baggett — possess relevant knowledge regarding communications concerning the Document, animosity and malice toward Plaintiff, and the identity of other members of the CCWC.

32

128. Plaintiff reserves the right to amend this Complaint to name additional or substitute defendants upon learning their true identities through discovery.

**Damages**

129. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff has suffered severe damage to her professional reputation. Plaintiff's reputation in the community, among government officials, among donors, and within the nonprofit sector has been substantially impaired.

130. Plaintiff has also suffered injury to her business and property, including, but not limited to, loss of income and potential bonuses proximately caused by the Defendants' predicate acts, as well as loss of future business opportunities. Her income and bonus are directly tied to the financial condition of the Foundation; as a result, declines in the number and amount of donations have led directly to an approximately 20% reduction in Plaintiff's salary and the loss of her bonus for 2025.

131. Plaintiff has also incurred costs and expenses attempting to identify the responsible parties and mitigate the harm caused by the unauthorized disclosures, defamatory publications, and predicate acts.

132. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered significant emotional harm, including severe anxiety, anxiety attacks, emotional distress, humiliation, embarrassment, loss of sleep, and mental anguish. The coordinated effort to publicly portray Plaintiff as dishonest and unethical, disclose confidential personal and professional information, and jeopardize her career has substantially affected Plaintiff's emotional well-being and daily life. Plaintiff has sought medical evaluation and treatment relating to the emotional effects of Defendants' conduct and continues to experience emotional distress. Plaintiff reserves the right

33

to supplement these allegations as discovery and expert testimony further develop the nature and extent of her injuries.

133. One of the principal objectives of Defendants' coordinated campaign was to undermine Plaintiff's existing professional relationships with the Foundation's Board of Directors, major donors, prospective donors, governmental officials, and other influential members of the community in order to cause Plaintiff's removal as CEO and to impair her present and future professional opportunities. Defendants intentionally directed the Document and related communications to those individuals whom Defendants believed possessed the ability to influence Plaintiff's employment, compensation, reputation, and professional standing and affirmatively damage Plaintiff as a result.

134. The Foundation has also suffered injury to its business and property, including, but not limited to, diversion of the Foundation's time and resources to addressing the Document's allegations and investigating its continued relationship with Plaintiff. These injuries have also included loss of income from donations, loss of funds to pay for the investigation by government regulators, and loss of reputation, all of which was proximately caused by the Defendants through their tortious conduct and pattern of racketeering activity. For example, the number of donors to the Foundation decreased by approximately 511 in 2025, as compared to 2024, which led to a reduction of approximately $420,000 in revenue to the Foundation in 2025, as compared to 2024, as a direct result of the publication of the Document. The reduction in donations, coupled with the costs attributable to addressing the issues raised by the publication of the Document, could result in approximately $1 million of losses to the Foundation. The loss of donations and the expenses attributable to addressing these allegations has continued in 2026 to this day.

## COUNT I VIOLATION OF THE STORED COMMUNICATIONS ACT
## 18 U.S.C. § 2701 ET SEQ.

135. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

136. The Stored Communications Act, 18 U.S.C. § 2701(a), provides that whoever intentionally accesses, without authorization and/or exceeding their authorization, a facility through which an electronic communication service is provided, or intentionally exceeds an authorization to access that facility, and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system, shall be subject to civil liability under 18 U.S.C. § 2707.

137. Upon information and belief, Defendants Wiggins, Stielow and/or Jane and John Doe(s) 1-10 intentionally or knowingly accessed, without authorization and/or exceeding the scope of their authorization, a facility through which an electronic communication service is provided — including but not limited to the email systems, servers, and electronic storage facilities used by Plaintiff and/or the Foundation — and thereby obtained electronic communications belonging to Plaintiff and the Foundation while those communications were in electronic storage and on the Foundation's server.

138. The Document contained Plaintiff's internal communications, including emails and other electronically stored information, that were only intended for Plaintiff in her personal capacity and/or her capacity as CEO of the Foundation. These communications were knowingly or intentionally obtained from electronic storage/the Foundation's server without Plaintiff's consent or authorization or, alternatively, in excess of the authority, if any, granted to Defendant Wiggins, Stielow and/or Jane and John Doe(s) 1-10.

139. In addition, upon information and belief, Defendants Birdsong, Lankford, Chandler, and Green, and John and Jane Doe(s) 1-10 knowingly or intentionally (1) acted in concert with other

Defendants to cause these stored communications to be obtained and (2) obtained these stored communications from another individual who had accessed them without authorization and/or exceeding the scope of their authorization, with knowledge or reason to know that such communications were obtained through unauthorized access.

140. With respect to each Defendant, Defendants' access to documents and information belonging to Plaintiff and the Foundation was not authorized or, in the alternative, exceeded the scope of Defendants' authorization.

141. As a direct and proximate result of Defendants' unauthorized access and dissemination of the materials referenced herein and violations of the Stored Communications Act, Plaintiff has suffered actual damages in an amount to be proven at trial.

142. Pursuant to 18 U.S.C. § 2707, Plaintiff is entitled to recover actual damages, including but not limited to damages to her reputation, lost wages, emotional distress damages, and costs of investigation; statutory damages; punitive damages; and reasonable attorneys' fees and costs of litigation.

### COUNT II VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030

143. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

144. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2), prohibits intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer.

145. Upon information and belief, Defendants Wiggins and Stielow and Jane and John Doe(s) 1-10 intentionally accessed one or more protected computers — including but not limited to computers and electronic systems used by Plaintiff and/or the Foundation for the storage of

36

electronic communications and records — without authorization or, alternatively, in excess of their authorized use.

146. In addition, upon information and belief, Defendants Birdsong, Lankford, Chandler, and Green, and John and Jane Doe(s) 1-10 knowingly or intentionally (1) acted in concert with other Defendants to cause a protected computer to be used and (2) obtained information from a protected computer via another individual(s) who had used the computer without authorization and/or exceeding the scope of their authorization, with knowledge or reason to know that such information was obtained through unauthorized access.

147. With respect to each Defendant, Defendants' access to computer(s) belonging to Plaintiff and the Foundation was not authorized or, in the alternative, exceeded the scope of Defendants' authorization.

148. As a result of such unauthorized access, Defendants obtained information from protected computers, including Plaintiff's confidential communications, financial records, personal records, and other proprietary information.

149. Defendants' conduct caused loss and damage to Plaintiff of at least $5,000 in value during a one-year period, including but not limited to costs of investigation, remediation, reputational harm, and other losses cognizable under 18 U.S.C. § 1030(e)(11).

150. Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain a civil action for compensatory damages, injunctive relief, and other equitable relief.

## COUNT III VIOLATION OF CIVIL RICO
### 18 U.S.C. § 1962(c)

151. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

152. At all relevant times, there existed an enterprise (the "Enterprise") as defined by 18 U.S.C. § 1961(4). The Enterprise is the CCWC. It is an association-in-fact enterprise, *i.e.*, a group of individuals and/or entities associated together for a common purpose. As discussed above, Defendants Chandler and Birdsong, among others, described themselves as part of a group of concerned citizens working with current and former Foundation staff members to use Plaintiff's and the Foundation's documents to "expose" Plaintiff and her supposed mismanagement of the Foundation.

153. The Enterprise consists of at least Defendants Wiggins, Stielow, Birdsong, Chandler, Lankford, and Green, and John and Jane Doe(s) 1-10. The Enterprise is an ongoing organization whose members function as a continuing unit for the common purpose of spreading misinformation about the Foundation and the Plaintiff in order to injure Plaintiff's reputation, her business, damage her financially, and remove her from her position as the Foundation's CEO. The Enterprise's purpose also extends to impacting, and damaging, the activities of the Foundation.

154. The Enterprise is distinct from each of the Defendants. The Enterprise has an ascertainable structure beyond the Defendants' predicate acts of racketeering. It has an existence separate and apart from the pattern of racketeering activity in which the Defendants engaged. Defendants Chandler and Birdsong, by their own admission, called themselves a group of concerned citizens with a common purpose.

155. As current and former employees of the Foundation with limited access to the Foundation's documents, Defendants Wiggins and Stielow voluntarily and improperly took confidential information that belonged to the Foundation and to Plaintiff and shared that information with

38

other members of the Enterprise. Defendants John and Jane Doe(s) 1-10, to the extent they were Foundation employees, were also responsible for this.

156. Defendants Birdsong, Lankford and Chandler solicited individuals to participate in the Enterprise and to gather information "regarding the Foundation and its current leadership." They were also actively involved in gathering negative information regarding the Foundation and Plaintiff. This included participating in meetings with "staff current and past." According to Defendant Chandler, Defendants Birdsong, Lankford and Chandler were also among those that created the Document. Defendants John and Jane Doe(s) 1-10 may also have been involved in these activities.

157. Then Defendants Birdsong, Chandler, and Green, and potentially John and Jane Doe(s) 1-10 and other members of the CCWC, published and disseminated the Document throughout the community via their email accounts, including anonymous accounts (savetheheritagefoundation@gmail.com and savingtheheritagefoundation@gmail.com), apparently created specifically for this purpose.

158. The Enterprise engaged in, and its activities affected, interstate commerce in that its members used the wires, mails, or instrumentalities of interstate commerce, in violation of 18 U.S.C. §1341 and §1343, as described herein.

**Pattern of Racketeering Activity**

159. Each Defendant has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

160. The pattern of racketeering activity consists of multiple related acts of racketeering, as defined by 18 U.S.C. § 1961(1), including but not limited to mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

39

161. The Defendants, individually and collectively, devised and intended to devise a scheme and artifice to use the interstate mails and wires, or cause the interstate mails and wires to be used, to harm Plaintiff and the Foundation, by means of materially false and fraudulent pretenses, representations, and material omissions, and force Plaintiff out of her position as CEO, damage her relationships with the Foundation, its board, donors and potential donors, injure her ability to earn income and bonuses as CEO of the Foundation, and cause her to incur tens of thousands of dollars of legal and other expenses. Defendants, individually and collectively, through their predicate acts intended to and did also harm the Foundation by damaging its reputation and thereby damaging its business by diminishing its donations and other funding and causing it to incur hundreds of thousands of dollars of expenses to investigate the allegations in the Document and respond to inquiries by the Attorney General's office, media outlets, and members of the community.

162. Each Defendant's predicate acts of racketeering are set forth below (and described in the allegations above); however, there are likely additional predicate acts that each Defendant has committed that are within each Defendant's exclusive knowledge, coupled with the fact that the CCWC is an intentionally anonymous organization, that Plaintiff has investigated with diligence, including by initiating a Rule 27 proceeding, but to date has not yet been able to ascertain. In addition, there may be other as yet unknown participants in the Enterprise who engaged in predicate acts that are not yet known in furtherance of their scheme. Plaintiff's diligence continues.

**Predicate Acts**

163. On or about August 23, 2024, in furtherance of the scheme, Defendant Stielow transmitted by means of wire communication in interstate commerce confidential Foundation cash flow projections from her Foundation email address to her personal stielowc@gmail.com email address. At some point thereafter, Stielow transmitted this email to the creators of the Document,

upon information and belief, by means of wire communication in interstate commerce such that it was later included in the 135-page version of the Document as allegedly evidencing "Going Concern Scenarios."

164. At other times prior to the publication of the Document, in furtherance of the scheme and upon information and belief, Defendant Stielow transmitted, or caused to be transmitted, by means of wire communication in interstate commerce additional confidential information about the Foundation and Plaintiff personally from her Foundation email address to her personal email address which was later transmitted by email to the creators of the Document such that it also was later included in the Document.

165. On or about March 31, 2025, in furtherance of the scheme, one or more Defendants transmitted by means of wire communication in interstate commerce a pseudonymous email from [CarrieMcGavock@protonmail.com](mailto:CarrieMcGavock@protonmail.com) to William Scales and Laura Camp, and perhaps others, entitled "Heritage Foundation Workplace Concerns with CEO" that contained numerous false allegations about Plaintiff and her management of the Foundation, her relationship with employees, and the financial condition of the Foundation. The email demanded that the recipients investigate Plaintiff and threatened to "go to the media."

166. On or about May 20, 2025, in furtherance of the scheme, Defendant Stielow transmitted confidential Foundation financial documents (used at an April 2025 board meeting) by means of wire communications in interstate commerce via email to Defendant Wiggins. These confidential financial documents ultimately were included in the Document to misleadingly portray the financial condition of the Foundation and mischaracterize Plaintiff's stewardship of the Foundation.

167. In the months before July 17, 2025, in furtherance of the scheme, Defendant Birdsong transmitted by means of wire communication in interstate commerce an email soliciting assistance

41

from both Foundation insiders and outsiders for a group of "concerned Franklin residents" who intended to "expose" Plaintiff and the "financial scandal" she allegedly created at the Foundation.

168. On June 25, 2025, in furtherance of the scheme, Defendant Birdsong transmitted by means of wire communication in interstate commerce an email to former Foundation CFO David Runyan soliciting his help to "expose" Plaintiff and the alleged "financial scandal."

169. On or about June 25, 2025, in furtherance of the scheme, Defendant Birdsong transmitted by means of wire communication in interstate commerce an email using her shelly@yourcommunity.media email address, several pages of "anonymous" letters, which later appeared in the Document to Defendant Green, Brett Jones, Roger M. Walters, Alexa Baker, Stephen Fahey, Kim Wardlow, Marc Driskill, Bob Barrett, Raina Warren, Bob Ravener, Alan Simms, and possibly others. In her email, she admitted that she was receiving information "regarding the Foundation and its current leadership" from current and former Foundation employees and "other interested parties." She also admitted that she was soliciting additional information about Plaintiff and the Foundation and that "there is a group of us," *i.e.*, the CCWC, that is "working to investigate further."

170. On or about June 26, 2025, in furtherance of the scheme, Defendant Walter Green transmitted by means of wire communication in interstate commerce an email using his greenwr7@gmail.com email address, materials which later appeared in the Document to Alderman Patrick Baggett with instructions to "Please use discretely[sic]!"

171. In the months before July 17, 2025, in furtherance of the scheme, Defendant Wiggins transmitted by means of wire communication in interstate commerce, including emails, Plaintiff's confidential Foundation correspondence, including but not limited to Plaintiff's correspondence included in the Document, upon information and belief, to other members of the CCWC, including the other Defendants.

42

172. In the months before July 17, 2025, in furtherance of the scheme, Defendant Wiggins transmitted Foundation documents by means of wire communication in interstate commerce, including by using a scanner at the Foundation connected to the Internet which then transmitted those documents via email to herself, other Defendants, and to other members of the CCWC.

173. In the months before July 17, 2025, in furtherance of the scheme, Defendant Wiggins transmitted by means of wire communication in interstate commerce, including by emails and scanning, her own retirement investment account statement to herself, to other Defendants, and/or to other members of the CCWC via the Internet-connected scanner.

174. In the months before July 17, 2025, in furtherance of the scheme, Defendant Stielow, on multiple occasions, transmitted by means of wire communication in interstate commerce, including emails, various Foundation emails on the Foundation's email system, using a scanner connected to the Internet, which then transmitted those documents via email to herself, other Defendants, and to other members of the CCWC.

175. In the months before July 17, 2025, in furtherance of the scheme, Defendants, including Defendant Stielow, transmitted by means of wire communication in interstate commerce, including emails, these Plaintiff-related and Foundation-related documents to the other Defendants and various members of the CCWC for review and inclusion in the final Document.

176. On or before July 17, 2025, in furtherance of the scheme, upon information and belief, Defendants Birdsong, Wiggins, Stielow, Chandler, Lankford, and Green, and other members of the CCWC, transmitted by means of wire communication in interstate commerce, including emails, these confidential documents belonging to Plaintiff and the Foundation that they had obtained, over the Internet to create a false and inaccurate Financial ChatGPT Analysis of the documents. That analysis was then transmitted back to the preparer(s) of the Document (particularly Defendants Birdsong, Chandler, and Lankford) over the Internet. The Financial

43

ChatGPT Analysis was included in the 128-page (or sometimes 135-page) Document which is entitled "Save the Heritage Foundation." The substance of the Document is described more fully above.

177. On or about July 17, 2025, or July 25, 2025, in furtherance of the scheme, the Document was transmitted by means of wire communication in interstate commerce, including emails, and/or using the interstate mail, by unknown members of the CCWC, to the Attorney General's Office for the State of Tennessee. In the transmittal of the Document, the sender specifically identified Plaintiff as the "person[] who may be responsible for this problem."

178. Between approximately July 18, 2025, and July 29, 2025, in furtherance of the scheme, the Document was transmitted by means of wire communication in interstate commerce, including emails, and/or using the interstate mail, iCloud links, and Google Drive links, to many individuals within the community, including notable community members, government officials, and donors.

179. For example, Defendant Birdsong transmitted the Document to numerous others via email using her Gmail address, savetheheritagefoundation@gmail.com.

180. Defendant Chandler transmitted the Document to numerous others via email using her Gmail address, savingtheheritagefoundation@gmail.com. In addition, in furtherance of the scheme, Defendant Chandler transmitted the Document by means of wire communication in interstate commerce, including email, to Ken Moore, the Mayor of Franklin, Tennessee on July 23, 2025, using her personal Gmail address, PChandler@live.com. In that email, Defendant Chandler admitted that at least she, Defendant Birdsong, and Defendant Lankford participated in creating the Document, "with help of documents and meetings from staff current and past." She also admitted that, regarding the Document, "[c]opies have been distributed to various media outlets and various appropriate state agencies."

181. On or about July 22 or July 24, 2025, in furtherance of the scheme, Defendant Walter Green transmitted the Document by means of wire communication in interstate commerce, *i.e.*, via a Google Drive link that he created using his Gmail address, greenwr7@gmail.com, to Ralene Debord, an important donor to the Foundation.

182. On or about July 23, 2025, in furtherance of the scheme, one of the Defendants transmitted the Document by means of wire communication in interstate commerce, including email to Rick Warwick.

183. On or about July 24, 2025, in furtherance of the scheme, one of the Defendants transmitted the Document by means of wire communication in interstate commerce, including email, to Greg Gamble.

184. On or about July 27, 2025, in furtherance of the scheme, one of the Defendants transmitted the Document by means of wire communication in interstate commerce, including email, to Alderman Bev Berger.

185. On or about July 18 through July 29, 2025, in furtherance of the scheme, one of the Defendants transmitted, or caused to be transmitted, the Document directly or indirectly, by means of wire communication in interstate commerce, including email, to Alderman Patrick Baggett.

186. On or about July 18 through July 29, 2025, in furtherance of the scheme, one of the Defendants transmitted the Document by means of wire communication in interstate commerce, including email, to Steve and Kay George.

187. On or about July 27, 2025, in furtherance of the scheme, Defendant Chandler, using her savingtheheritagefoundation@gmail.com transmitted the Document by means of wire communication in interstate commerce separately to Foundation board member William Scales and Foundation board member Tyler Borders.

45

188. On or about July 29, 2025, in furtherance of the scheme, Foundation board chair William Scales and board member John Bond each received the Document by means of wire communication in interstate commerce, including email, from Wanda Worries, a pseudonym with the email address, wandaworries@gmail.com. Upon information and belief, Wanda Worries is one of the Defendants. Among other things, Scales and Bond were each directed to commission an independent forensic audit and launch a legal investigation with respect to Plaintiff.

189. On or about July 18 through July 29, 2025, in furtherance of the scheme, Defendants and/or other members of the CCWC also uploaded the Document to iCloud so others could access the Document through an iCloud link and then shared the iCloud link with others via email. Each of these activities constitutes the transmission of the Document by means of wire communication in interstate commerce, including email.

190. On or about July 18 through July 29, 2025, in furtherance of the scheme, Defendants and/or members of the CCWC also uploaded the Document to Google Drive so others could access the Document through Google Drive. On or about July 22, 2025, Defendant Green created the Google Drive link used to share the Document. Defendants and/or members of the CCWC also shared the Google Drive link with others via email. Each of these activities constitutes the transmission of the Document by means of wire communication in interstate commerce, including email.

191. Copies of the Document were also mailed to other individuals through the U.S. Mail. In other instances, copies of the Document may have been deposited into mailboxes directly, without the requisite United States Postal Service postage. For example, Marty Ligon received the Document through the mail on or about July 26, 2025.

192. On or about July 26, 2025, in furtherance of the scheme, Defendants and/or members of the CCWC transmitted the Document by means of mails or wire communication in interstate

46

commerce, including email. Shortly thereafter, on or about July 31, 2025, excerpts from the Document were published by the Williamson Herald newspaper. The article was entitled "Heritage Foundation Board Responds to Scrutinizing Allegations," which publicized again false and misleading statements from the Document.

193. On or about July 18 through July 29, 2025, in furtherance of the scheme, upon information and belief, one of the Defendants transmitted the Document by means of wire communication in interstate commerce, including email, to the publisher of the Facebook page entitled, "Williamson Wrong." Shortly thereafter, the Facebook page published portions of the Document on its website and/or on its Substack webpage.

194. In addition, upon information and belief, Defendants and/or other members of the CCWC transmitted the Document by the mails and wires, including via email and the Internet, to numerous other third parties. At present, the facts surrounding these transmissions are only known to the Defendants, including John and Jane Doe 1-10, and other members of the CCWC and are in their exclusive possession. In addition, since the CCWC is an anonymous organization, additional details about its activities, including the predicate acts of mail and wire fraud committed by its members, cannot be known without discovery. Plaintiff conducted substantial due diligence, including initiating Rule 27 proceedings in state court, to gather additional information in support of her allegations; however, Defendants and other third-parties opposed those efforts in state court.

195. A reasonable person would have known, or at least have foreseen, that the mails and the wires would be used as a part of Defendants' fraudulent scheme. And in fact each of these acts of mail fraud or wire fraud was at least an incidental part, or a step in the plot, of the execution of Defendants' fraudulent scheme as Defendants conceived it to disseminate the Document in order

47

to deprive Plaintiff of her employment and her reputation, damage her financially, and harm the Foundation with respect to its donations and financial support.

196. Each of the Defendants either used the mails and wires, or at least would have foreseen that the mails and wires would be used, as part of the furtherance of their fraudulent scheme.

## Relatedness and Continuity

197. The predicate acts described herein constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The predicate acts are related to one another in that they have the same or similar purposes; involve the same Defendants; involve the same victims (Plaintiff and the Foundation); and involve the same or similar methods of commission. Defendants' predicate acts are not isolated events.

198. The pattern of racketeering activity poses a threat of continued criminal activity, i.e., open-ended continuity, because the predicate acts themselves involve a distinct threat of long-term racketeering activity, and the predicate acts are a regular way that the Defendants conduct their ongoing business activities through the CCWC. None of the Defendants has indicated that they intend to cease their predicate acts or no longer seek to injure Plaintiff and the Foundation. To the contrary, the primary goal of the CCWC's coordinated smear campaign is to unseat Plaintiff and install a different CEO – someone pliable who would do the CCWC's bidding. In fact, members of the CCWC have insinuated to the Foundation's board members that the public campaign would cease if Plaintiff were fired and additional board seats were allocated to CCWC members or allies.

## Defendants' Role in the Enterprise

199. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who is associated with the Enterprise.

48

200.     Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described herein.

201.     Specifically, Defendants Wiggins and Stielow, among others, were the primary members of the Enterprise who collected documents and information from Plaintiff and the Foundation, without authorization and/or exceeding the scope of their authorization, and shared those documents and information with the other Defendants and/or other members of the Enterprise. These Defendants engaged in multiple acts of mail fraud and/or wire fraud in the commission of these activities.

202.     Defendant Birdsong, among others, solicited assistance from members of the community including, upon information and belief, the Foundation to join the Enterprise, gather information, and disseminate the Document. Defendant Birdsong engaged in multiple acts of mail fraud and/or wire fraud in the commission of these activities.

203.     Defendants Birdsong, Lankford, and Chandler, among others, created the Document, including the Financial ChatGPT Analysis, which contained numerous false statements and material omissions about Plaintiff and the Foundation.

204.     All the Defendants, including Defendant Green, were among the primary members of the Enterprise who disseminated the Document to various members of the community, including the press, government officials, and current and potential donors to the Foundation. These Defendants engaged in multiple acts of mail fraud and/or wire fraud in the commission of these activities.

205.     Defendants John and Jane Doe 1-10 also participated in each of these activities, including disseminating the Document. These Defendants engaged in multiple acts of mail fraud and/or wire fraud in the commission of these activities.

**Injury and Causation**

206.     Plaintiff has been injured in her business or property by reason of Defendants' violation of 18 U.S.C. § 1962(c). The injuries suffered by Plaintiff were directly and proximately caused by Defendants' pattern of racketeering activity.

207.     As a direct and proximate result of Defendants' racketeering activity, Plaintiff has sustained injuries to her business or property. Plaintiff's compensation is directly tied to the Foundation's financial condition. The number of donors to the Foundation has diminished by over 500 because of the publication of the Document, and the amount of donations the Foundation has received has decreased by over $400,000, because of the publication of the Document. Defendants' racketeering activity also directly led to internal investigations at the Foundation and an investigation by the Attorney General's office. As a direct result of Defendants' predicate acts, therefore, Plaintiff's compensation has been reduced by at least $50,000 a year. Because of Defendants' predicate acts related to the publication of the Document, she also did not receive a bonus in 2025. In addition, the goal of Defendants' activities has been to have her replaced as CEO of the Foundation to change the leadership, and thus the direction, of the Foundation. Defendants' activities have jeopardized Plaintiff's employment and status with the Foundation.

208.     In addition, because of Defendants' predicate acts, Plaintiff has spent tens of thousands of dollars investigating the allegations in the Document and defending herself throughout the community. She has also suffered threats to her employment, reputational harm and damage to her pre-existing business relationships with donors, potential donors, and other members of the community, both in Franklin and around the country.

209.     Plaintiff's injuries are not speculative. The damages are capable of calculation and proof with reasonable certainty.

210. Plaintiff is entitled to recover treble the damages she sustained, together with costs and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT IV VIOLATION OF CIVIL RICO
## 18 U.S.C. § 1962(d) – CONSPIRACY TO VIOLATE SECTION 1962(C)

211. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

212. Each Defendant knowingly and willfully conspired and agreed, directly and indirectly, with his or her co-Defendants and other persons known and unknown, including John Doe and Jane Doe 1-10, to violate 18 U.S.C. § 1962(c) — that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

213. In furtherance of the conspiracy, each Defendant further agreed that one or more of the Defendants would commit the overt acts described herein; and each of the Defendants in fact did so.

214. As a direct and proximate result of Defendants' conspiracy in violation of 18 U.S.C. § 1962(d), Plaintiff and the Foundation have been injured in her business or property, and Plaintiff is entitled to recover threefold the damages she sustained, together with costs and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT V INVASION OF PRIVACY — PUBLICATION OF PRIVATE FACTS
## (TENNESSEE COMMON LAW)

215. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

216. Defendants published private facts about Plaintiff, including personal and sensitive nonprofit matters, financial information, personal records, and information concerning Plaintiff's minor daughter, without Plaintiff's consent.

51

217. Defendants publicized these private facts widely, including to members of the community, government officials, donors, through the Williamson Herald newspaper, and online via the Williamson Wrong blog.

218. The matters publicized were private in nature, not of legitimate public concern, and their disclosure would be highly offensive to a reasonable person, exceeding the limits of decency. The information disclosed included Plaintiff's private emails, confidential internal Foundation communications, personal family details, and information about Plaintiff's minor daughter.

219. The matters publicized concerning Plaintiff's personal family details and her minor daughter were neither matters of public record nor of legitimate public concern prior to the release of the Document.

220. As a direct and proximate result of Defendants' invasion of Plaintiff's privacy, Plaintiff has suffered damages, including damage to her professional reputation, injury to her business and employment, emotional harm, mental anguish, and humiliation.

## COUNT VI DEFAMATION (TENNESSEE COMMON LAW)

221. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

222. Defendants intentionally created and circulated false and misleading statements injurious to Plaintiff's personal reputation as well as her professional reputation as the CEO of the Foundation. Specifically, the Document accused Plaintiff and Plaintiff's family members of misconduct, including misappropriation of corporate funds, and disclosed false details about Plaintiff's family.

223. The Document's false and misleading allegations and accusations concerning the Foundation were also of or concerning the Plaintiff by implication, as the Foundation's leader and CEO. The primary goal of the CCWC's coordinated smear campaign was to unseat Plaintiff and install a different CEO – someone pliable who would do the CCWC's bidding. In fact, members of the

52

CCWC have insinuated to the Foundation's board members that the public campaign would cease if Plaintiff were fired and additional board seats were allocated to CCWC members or allies.

224. The false and misleading statements were widely published and communicated to third parties, including community members, government officials, and donors throughout Williamson County and the broader Middle Tennessee community. This was accomplished through the Williamson Herald newspaper, and online via emails, Google Drive, and websites such as Williamson Wrong.

225. Defendants published the false and defamatory statements described herein with actual malice. Defendants knowingly published materially false factual assertions, deliberately omitted material facts necessary to prevent those assertions from misleading their readers, selectively presented confidential Foundation documents and communications out of context, mischaracterized ordinary Foundation operations as evidence of misconduct, and presented the resulting publication as an objective factual investigation. Defendants either knew their factual assertions were false or acted with reckless disregard for whether those assertions were true or false.

226. The false statements are defamatory per se in that they impute misconduct, dishonesty, unethical, and potentially criminal conduct (misappropriation of corporate funds, alteration of Foundation documents, and misrepresentations to the Foundation board in potential violation of her fiduciary duties) to Plaintiff in her professional capacity. They have been used as the predicate for multiple people in the community calling for her to be removed from her position as CEO of the Foundation, in both public and private settings.

227. As a direct and proximate result of Defendants' defamation, Plaintiff has suffered damages, including but not limited to damage to her professional reputation, financial harm, injury to her business and employment, loss of standing in the community, emotional distress, and mental anguish.

## COUNT VII FALSE LIGHT INVASION OF PRIVACY
## (TENNESSEE COMMON LAW)

228. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though fully set forth herein.

229. Through the creation, publication, and widespread dissemination of the Document and related communications, Defendants knowingly and intentionally publicized information concerning Plaintiff in a manner that placed Plaintiff before the public in a false light.

230. Although portions of the Document contained authentic Foundation records, emails, financial information, and other documents, Defendants selectively quoted, excerpted, omitted, and characterized those materials in a misleading manner that created a false overall impression concerning Plaintiff's honesty, integrity, ethics, professional competence, and fitness to serve as CEO of the Foundation.

231. Defendants further reinforced this false impression by combining selective factual information with materially false factual assertions, misleading omissions, and the Financial ChatGPT Analysis, thereby presenting readers with what purported to be an objective and comprehensive investigation into Plaintiff's conduct.

232. The overall impression conveyed by the Document was that Plaintiff had engaged in financial misconduct, dishonesty, ethical violations, self-dealing, conflicts of interest, manipulation of Foundation records, and other improper or potentially unlawful conduct. That overall portrayal was false.

233. Defendants knew that the overall portrayal of Plaintiff created by the Document was false or acted with reckless disregard as to whether that portrayal was true or false. Defendants intentionally omitted material information that contradicted their accusations, selectively presented confidential records out of context, and structured the Document to maximize the appearance that Plaintiff had engaged in wrongdoing.

234. Defendants widely publicized the Document and its accusations by transmitting it to Foundation donors, elected officials, members of the media, government agencies, members of the Foundation's Board of Directors, and numerous other members of the community, ensuring that the false portrayal of Plaintiff would be broadly disseminated.

235. The false light in which Defendants placed Plaintiff would be highly offensive to a reasonable person because it falsely portrayed Plaintiff as dishonest, unethical, financially irresponsible, professionally incompetent, and unfit to serve in her leadership position, while simultaneously exposing Plaintiff's confidential personal and professional information to public scrutiny.

236. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial damages, including injury to her personal and professional reputation, humiliation, embarrassment, emotional distress, mental anguish, injury to her business and employment, loss of standing within the community, and other damages to be proven at trial.

## COUNT VIII INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (TENNESSEE COMMON LAW)

237. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

238. Defendants intentionally released confidential and personal information in a manner calculated to cause distress to Plaintiff. Defendants compiled and disseminated a 128-page (or sometimes 135-page) document combining stolen confidential materials with patently false allegations — including claims about Plaintiff's minor daughter — in a calculated campaign to destroy Plaintiff's reputation and cause her severe emotional harm and to injure her in her business and employment, including by compelling her removal as the Foundation's CEO.

239. Defendants' conduct was intentional or reckless, was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and it was atrocious and utterly intolerable in a civilized community.

55

240. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff has suffered serious emotional injury. Among other things, Plaintiff has experienced severe anxiety, humiliation, embarrassment, mental anguish, loss of sleep, and significant emotional distress arising from Defendants' coordinated effort to destroy her professional reputation, jeopardize her employment, expose confidential personal information, and subject her to public ridicule. Plaintiff has sought medical evaluation and treatment for the emotional effects of Defendants' conduct. The emotional injuries suffered by Plaintiff are serious, ongoing, and exceed the level of ordinary worry, annoyance, embarrassment, or disappointment.

241. Defendants either intended to inflict severe emotional distress upon Plaintiff or acted with reckless disregard of the near certainty that publicly accusing Plaintiff of dishonesty, financial misconduct, ethical violations, and professional incompetence while simultaneously disclosing confidential personal information and information concerning Plaintiff's family would cause severe emotional harm.

**COUNT IX INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS (TENNESSEE COMMON LAW)**

242. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though fully set forth herein.

243. At all relevant times, Plaintiff maintained existing and prospective business relationships with the Foundation, members of its Board of Directors, current and prospective donors, sponsors, governmental officials, community leaders, business partners, and others whose support and confidence were important to Plaintiff's continued employment, professional reputation, fundraising efforts, compensation, and future economic opportunities.

244. Defendants knew of these existing and prospective business relationships. Indeed, Defendants intentionally directed their conduct toward those very relationships by disseminating the Document to members of the Foundation's Board of Directors, significant donors, prospective

56

donors, elected officials, governmental agencies, members of the media, and other influential members of the Williamson County community.

245. Defendants intended to interfere with Plaintiff's business relationships and employment or, at a minimum, knew that interference with those relationships was substantially certain to occur as a result of their conduct.

246. Defendants employed improper means and acted with an improper purpose in interfering with Plaintiff's business relationships, including, but not limited to:

a. publishing false and defamatory statements concerning Plaintiff;

b. unlawfully obtaining, using, and disseminating Plaintiff's confidential communications and Foundation records;

c. invading Plaintiff's privacy;

d. selectively presenting confidential documents in a materially misleading manner;

e. intentionally omitting material facts necessary to prevent the Document from misleading its readers;

f. coordinating the widespread dissemination of the Document to individuals capable of influencing Plaintiff's employment and professional reputation;

g. engaging in a civil conspiracy to damage Plaintiff's reputation and employment; and

h. committing the other wrongful acts alleged throughout this Complaint.

247. Defendants' conduct was motivated, at least in substantial part, by a desire to cause Plaintiff's removal as CEO of the Foundation and to impair Plaintiff's professional standing within the nonprofit community.

248. As a direct and foreseeable result of Defendants' conduct, Plaintiff's relationships with members of the Foundation's Board of Directors, donors, prospective donors, community leaders, governmental officials, and others were disrupted or materially impaired.

249. Defendants' conduct has caused Plaintiff to suffer, among other damages, loss of compensation, loss of bonus opportunities, diminished professional reputation, diminished future earning capacity, loss of valuable business opportunities, impairment of existing and prospective professional relationships, and other economic damages in an amount to be proven at trial.

250. Defendants' conduct was intentional, malicious, and undertaken with conscious disregard of Plaintiff's rights, thereby entitling Plaintiff to recover all compensatory and punitive damages permitted by Tennessee law.

### COUNT X CIVIL CONSPIRACY (TENNESSEE COMMON LAW)

251. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

252. Two or more of the Defendants, and/or Defendants acting in concert with other individuals, entered into an agreement or combination to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means — namely, to unlawfully obtain and disseminate Plaintiff's confidential information, to invade her privacy, to defame her, to cause her emotional distress, and to cause injury to her business and employment, including her removal as Foundation CEO.

253. In furtherance of the conspiracy, Defendants committed overt acts, including: (a) obtaining, without authorization and/or exceeding the scope of their authorization, Plaintiff's confidential electronic communications and records; (b) compiling those materials into the 128-page (or sometimes 135-page) Document; (c) drafting (with ChatGPT's flawed assistance) false, misleading, and defamatory statements to accompany the stolen materials; (d) publishing and distributing the Document to members of the community, government officials, donors, and the media; and (e) coordinating with one another to conceal their identities.

254. As a direct and proximate result of the conspiracy and the overt acts committed in furtherance thereof, Plaintiff has suffered damages as set forth herein.

## COUNT XI INTRUSION UPON SECLUSION (TENNESSEE COMMON LAW)

255. Plaintiff repeats and re-alleges each of the foregoing paragraphs as though set forth fully herein.

256. Upon information and belief, although Defendants Wiggins and Stielow lacked authority to do so, Defendants Wiggins and Stielow collected, copied, organized, and provided Plaintiff's confidential communications and records to other Defendants for purposes wholly unrelated to Foundation business. At a minimum, these Defendants exceeded any authority they possessed as Foundation employees by accessing and transmitting these materials to others outside the organization. The remaining Defendants knowingly solicited, accepted, organized, retained, and used those confidential materials despite knowing they had been obtained by unauthorized means.

257. Defendants were never authorized to search for, collect, copy, organize, retain, or disseminate Plaintiff's confidential communications or personal information for their own purposes or for the benefit of third parties. Instead, Defendants intentionally acted without authority in doing so, or by exceeding the scope of any authority granted to them and abusing the positions of trust and confidence placed in them by Plaintiff and the Foundation. Upon information and belief, Defendants further coordinated with one another over a period of months to obtain, organize, compile, and use these materials for purposes wholly unrelated to any legitimate Foundation business.

258. Upon information and belief, Defendants intentionally accessed, searched for, selected and transmitted communications concerning Plaintiff's family, personal relationships, and private affairs despite those matters having no legitimate connection to their employment responsibilities or any legitimate Foundation purpose.

259. The information intentionally and improperly obtained by Defendants included Plaintiff's private emails, confidential internal Foundation communications, executive correspondence,

59

Board communications, confidential financial records, employee communications, draft documents, personal family information, information concerning Plaintiff's minor daughter, and other confidential materials that Plaintiff reasonably expected would remain private and would not be accessed, copied, organized, retained, or disclosed. Upon information and belief, Defendants intentionally and improperly sought information extending beyond legitimate Foundation operations and into Plaintiff's private personal and family affairs.

260. Defendants intentionally accumulated confidential communications over an extended period of time, organized those communications by subject matter, and compiled them into a comprehensive dossier concerning Plaintiff's professional and personal life for purposes wholly unrelated to any legitimate Foundation business.

261. The information intentionally obtained and compiled by Defendants concerned Plaintiff's private affairs and was not otherwise available to the public. Plaintiff reasonably expected that these confidential communications and records would not be accessed, copied, organized, retained, transmitted, or exploited for personal, retaliatory, or other unauthorized purposes.

262. Defendants' intentional obtaining, collection, organization, compilation, retention, and exploitation of Plaintiff's confidential communications, financial records, personal information, family information, and information concerning Plaintiff's minor daughter would be highly offensive to a reasonable person. Defendants deliberately abused positions of trust to create a comprehensive dossier concerning Plaintiff's personal and professional life for the purpose of damaging Plaintiff's reputation, employment, and livelihood. Such conduct constituted a substantial and intentional invasion of Plaintiff's privacy.

263. Plaintiff had a reasonable expectation of privacy in her confidential electronic communications, internal Foundation correspondence, personal records, family information, and other materials maintained on Foundation electronic systems and in confidential files. Neither

60

Plaintiff nor the Foundation authorized Defendants to obtain, copy, organize, compile, retain, or disseminate those materials externally or as part of a coordinated effort to injure Plaintiff. Plaintiff's injury began when Defendants intentionally invaded her private affairs by obtaining, organizing, compiling, and exploiting her confidential communications and personal information for their own gain. The subsequent dissemination of those materials substantially amplified Plaintiff's damages but was not necessary to complete Defendants' intrusion upon Plaintiff's seclusion and private affairs.

264. As a direct and proximate result of Defendants' intrusion upon Plaintiff's seclusion and their intentional obtaining, organization, compilation, retention, transmittal and exploitation of Plaintiff's confidential communications and private information, Plaintiff has suffered damages including financial injury, injury to her business and employment, emotional distress, humiliation, loss of privacy in her confidential communications, personal affairs, and family information, and damage to her personal and professional reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

A. Compensatory damages in an amount to be determined at trial, including but not limited to damages from loss of income and bonuses, for harm to Plaintiff's professional reputation, loss of standing in the community, emotional distress, mental anguish, and humiliation;

B. Actual and/or statutory damages as permitted under 18 U.S.C. § 2707;

C. Compensatory damages as permitted under 18 U.S.C. §1030(g);

D. Treble damages in an amount to be proven at trial, pursuant to 18 U.S.C. § 1964(c);

61

E. Punitive damages in an amount sufficient to punish Defendants for their willful, wanton, and malicious conduct and to deter similar conduct in the future;

F. Injunctive relief requiring Defendants to cease and desist from further publication or distribution of Plaintiff's confidential materials and any defamatory statements concerning Plaintiff;

G. An order requiring Defendants to disclose the identities of all persons involved in the creation, compilation, distribution, and publication of the Document;

H. A permanent injunction enjoining Defendants from engaging in further racketeering activities;

I. Reasonable attorneys' fees and costs of litigation as permitted by law, including 18 U.S.C. § 2707(b)(3) and 18 U.S.C. §1964(c);

J. Pre-judgment and post-judgment interest as allowed by law; and

K. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

**Barnes & Thornburg LLP**

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker, #29627
1600 West End Avenue
Suite 800
Nashville, TN 37203
T: 615-621-6012
joy.longnecker@btlaw.com

*Attorney for Plaintiff Bari Beasley*

62